[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-15519

_____

D.C. Docket No. 0:14-cr-60312-KAM-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

GREGORY MOORE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(April 4, 2018)

Before ED CARNES, Chief Judge, MARCUS, Circuit Judge, and ROSS,[*] District
Judge.

PER CURIAM:

_____

[*] Honorable Eleanor Louise Ross, United States District Judge for the Northern District
of Georgia, sitting by designation.

A jury found Gregory Moore guilty of five counts of carjacking, 18 U.S.C. § 2119(1), and five accompanying counts of carrying and using a firearm during and in relation to crimes of violence, id. § 924(c)(1)(A)(ii), (iii).  He was sentenced to 1,452 months imprisonment, which reflected the mandatory consecutive terms for the firearms charges.  He appeals his convictions and sentence.

I.

A.

Moore met Danielle Roland in the summer of 2014, and the two began dating.  When Roland broke up with Moore a few months later, Moore grew angry, began calling her repeatedly, and threatened to kill her.  One night Moore broke into her home, and Roland and her new boyfriend found Moore asleep in her bed with a gun.  The police were called to the scene, and Roland moved out the next day.

Two days later, on December 2, 2014, Moore committed a series of carjackings in his attempt to get to and from Roland's workplace, Reimer Insurance.  First, he stole a Suzuki Aerio while it was stopped at an intersection.  He climbed into the back of the car, pointed a gun toward the front, and ordered the driver to drive onto the highway.  When she did not, Moore pulled the emergency break and ordered the driver and her son out of the car.  He drove the Suzuki until he wrecked it.  Moore then approached a Chevy Silverado stopped at a

stoplight and told the driver to "get the fuck out of the car" while pointing a gun at his head.  He drove that truck to Reimer, pulling into the parking lot a few minutes before Roland and her boyfriend arrived.

When Moore saw Roland's car driving into the lot, he ran toward it and began shooting into the front windshield.  Roland tried to escape by driving down a back alley, but it was blocked.  Moore walked up to the car, shot Roland five times in the stomach and legs, pulled her out of the car by her head, and "pistol whipped" her, while saying "Bitch, Imma kill you."  Moore also shot Roland's boyfriend, who managed to escape the car but died later that day from gunshot wounds. Leaving Roland for dead, Moore climbed back into the truck and drove toward I-95.

While driving down the interstate, Moore stopped the truck twice and attempted to steal the cars stopped behind him.  The driver of a Kia Soul testified that Moore stopped the truck, got out, and walked toward him with a gun pointed toward his face.  Fearing for his life, the driver accelerated, hit Moore, and drove away.  A driver of a Saturn Outlook similarly testified that Moore stopped in front of him, got out of the truck, and pointed a gun toward his face.  Fearing for his life, that driver also accelerated and drove away.

During this second encounter, Moore's truck had continued forward and it crashed into a cement wall located in the median.  Stranded, Moore turned to a

3

silver Mercedes stopped a few feet away.  He walked toward the driver with a gun pointed toward her head and told her to "get out of the car, bitch, or I'll blow your head off."  He then pulled her out of the car and fired a shot as she ran away.  Moore later abandoned the Mercedes along I-95 and went into hiding.  FBI agents found and arrested him a few days later, and a grand jury indicted him on five counts of carjacking and five counts of carrying and using a firearm during and in relation to crimes of violence.

## B.

Before trial on those charges, Moore sought to exclude as irrelevant and unduly prejudicial evidence of what happened at Roland's home before the string of carjackings began.  He had broken into the home and was asleep with a gun in Roland's bed.  He also sought to exclude evidence showing that after he was arrested for the entry and then released, Moore went to Roland's workplace and shot her and her boyfriend, who died.  The court denied both motions, finding that evidence of the entry was relevant to Moore's identity, intent, and motive, and that evidence of the shooting was relevant because it was "inextricably intertwined" with the carjackings and "pertain[ed] to the chain of events and explain[ed] the context, motive and set-up of the charged crimes."  The court also found that under Rule 403 evidence of both events was admissible because its probative value outweighed any prejudicial effect.  Although the court admitted evidence of both

4

events, it gave a limiting instruction on prior acts evidence during trial and as part of its final instructions, informing the jury that the evidence could be used to establish only Moore's intent, motive, or plan, but not "to decide whether Mr. Moore engaged in the activity alleged in the indictment."

At trial, the government called all of the carjacking victims, each of whom testified that Moore took or attempted to take his or her car while pointing a gun in their direction or at their face. The government also called a number of witnesses to the shooting, including Roland, and submitted evidence showing that DNA from Roland was found in what appeared to be a small blood stain in one of the carjacked cars and that bullets and bullet casings found at Reimer matched the gun found where Moore abandoned the fifth car. Last, the government presented the testimony of Moore's cousin, Jonathon Marion, and the mother of his child, Tequila Ingram. While Moore was hiding with Marion and Ingram, he confessed that he shot Roland and committed several carjackings to get to and from Reimer.

At the end of Ingram's testimony the government asked her, "[W]hat is the only thing that the Government ever has asked you to do?" Ingram responded, "Not to bring up [Moore's] priors." The government then refined its question, "In terms of your testimony and what you're going to talk about today, what is the only thing that we've ever asked of you?" To which Ingram responded, "To tell the truth." After that testimony, Moore moved for a mistrial because Ingram

5

"gratuitously spouted out not to mention his priors."  Moore acknowledged that the government was trying "to get her to say we've told you to tell the truth," but maintained that Ingram's comment was "highly prejudicial."  The court denied the motion but offered to read a curative instruction, which Moore declined.

After both sides rested, the jury found Moore guilty of the five carjackings and the five correlating firearms charges.  And the court, over Moore's objections, sentenced him to 1,452 months imprisonment.  That sentence was the total of the following ten sentences:  168 months, concurrent, on each of the five carjackings; 84 months, consecutive, on the first firearms offense; and 300 months, all consecutive, on each of the four remaining firearms offenses.  This is Moore's appeal.

## II.

We review for an abuse of discretion the district court's evidentiary rulings and the denial of a mistrial.  Vista Mktg., LLC v. Burkett, 812 F.3d 954, 979 (11th Cir. 2016); United States v. Newsome, 475 F.3d 1221, 1227 (11th Cir. 2007).  We review de novo constitutional sentencing issues and questions of statutory interpretation.  United States v. Harris, 741 F.3d 1245, 1248 (11th Cir. 2014); United States v. Maturin, 499 F.3d 1243, 1245 (11th Cir. 2007).

Moore contends that the trial court abused its discretion by allowing the government to introduce evidence that Moore entered Roland's home and that he

6

shot Roland and her boyfriend.  He also contends that the court abused its discretion by denying Moore's motion for mistrial after Ingram referenced Moore's prior criminal history before the jury.  And he contends that imposition of four consecutive 300-month (25-year) sentences on four of the five firearms counts are counter to the rule of lenity and violate the Eighth Amendment.

## A.

Moore argues that evidence showing that he broke into Roland's house, was found asleep with a gun in her bed, and that two days later he shot Roland and her boyfriend was irrelevant and substantially more prejudicial than probative.  We disagree.

Moore first asserts that evidence of those other acts is irrelevant because its only purpose was to illustrate his alleged criminal propensity, and under Federal Rule of Evidence 404(b) "[e]vidence of a crime, wrong, or other act" is inadmissible when used to show a person's propensity to act in conformance with a particular character trait.  Fed. R. Evid. 404(b)(1).  But Rule 404(b) applies only when the disputed evidence is extrinsic to the charged offense.  See United States v. Edouard, 485 F.3d 1324, 1344 (11th Cir. 2007).  Evidence is intrinsic, and therefore outside the scope of Rule 404(b), when it is "inextricably intertwined" with the evidence regarding the charged offense.  Id.

Evidence that Moore planned to harm Roland is "inextricably intertwined"

7

with the five carjackings.  Each carjacking, though an independent crime, was part of Moore's larger plan to get to Roland's workplace, shoot her, and then get away. Evidence that Moore had been found in Roland's bed two nights before and that he shot Roland during the spree explains why Moore committed the carjackings and was "necessary to complete the story of the crime."  Id.; see also United States v. McLean, 138 F.3d 1398, 1403 (11th Cir. 1998) ("Evidence, not part of the crime charged but pertaining to the chain of events[,] explaining the context, motive[,] and set-up of the crime, is properly admitted if . . . [it] forms an integral and natural part of an account of the crime, or is necessary to complete the story of the crime for the jury.") (quotation marks omitted).  Evidence of the shooting also combatted Moore's primary defense that the government could not identify him as the person who committed the carjackings.  Multiple witnesses identified Moore as the shooter, and the government's physical evidence tied the shooting to the carjackings.  Roland's DNA was found in a stain in one of the cars, and the gun found near the fifth car matched bullets and casings found at Reimer.

Moore also asserts that the evidence should have been excluded because "its probative value is substantially outweighed by a danger of . . . unfair prejudice." Fed. R. Evid. 403.  Rule 403 is an extraordinary remedy and it should be "limited to excluding matter of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect."  United States v. Mills, 704 F.2d 1553, 1560

8

(11th Cir. 1983) (quotation marks omitted).  As explained above, the probative value of the disputed evidence was great because it demonstrated Moore's motive and plan and countered Moore's primary defense.  And the district court lessened any prejudice by giving a limiting instruction to the jury during trial and again before its final deliberations to consider evidence of prior acts only for the limited purpose of proving Moore's intent, motive, or plan.  See United States v. LaFond, 783 F.3d 1216, 1222 (11th Cir. 2015) (concluding that "the district court lessened the prejudicial impact when it repeatedly instructed the jury to consider the evidence for only the limited purpose of proving intent and motive").

Because the evidence of Moore's other acts was relevant and its probative value outweighed any prejudice, the district court did not abuse its discretion by denying Moore's motion to exclude it.

## B.

Moore also contends that the district court abused its discretion when it denied his motion for mistrial.  He argues that Ingram intentionally stated that Moore had "priors" and that this reference prejudiced the jury.

"The mere utterance of the word jail, prison, or arrest does not, without regard to context or circumstances, constitute reversible error per se."  United States v. Emmanuel, 565 F.3d 1324, 1334 (11th Cir. 2009).  Ingram testified that the government told her "[n]ot to bring up [Moore's] priors."  She did not discuss

9

those priors or mention his prior convictions again.  Moore admitted at trial that her answer was unelicited and that she immediately corrected her response to give the elicited statement — that the government had told her "[t]o tell the truth."  A solitary, unelicited, and vague reference to "priors" in the context of a multi-day trial is insufficient to show that the district court abused its discretion by denying Moore's motion for a mistrial.  See id. ("[W]here the comment is brief, unelicited, and unresponsive, adding nothing to the government's case, the denial of a mistrial is proper.").

## C.

Moore next contends that the district court erred by imposing four consecutive 300-month (25-year) sentences under § 924(c).  That subsection states that "any person who, during and in relation to any crime of violence . . . uses or carries a firearm" and brandishes that firearm will "be sentenced to a term of imprisonment of not less than 7 years."  18 U.S.C. § 924(c)(1)(A)(ii).  But "[i]n the case of a second or subsequent conviction" the minimum sentence is 300 months imprisonment and that sentence must run consecutively "with any other term of imprisonment imposed on the person."  Id. § 924(c)(1)(C)(i), (D)(ii).  Moore's total sentence for the five § 924(c) convictions was 1284 months (107 years).[1]

## 1.

---

[1] Moore does not challenge his first § 924(c) sentence of 84 months consecutive, nor does he challenge his concurrent 168-month carjacking sentences.

Moore argues that the language of § 924(c) is ambiguous and for that reason, the district court should have applied the rule of lenity in interpreting its terms and vacated his four consecutive 300-month (25-year) sentences. Moore asserts that because he used the same firearm in each of the five carjackings, he committed only one § 924(c) offense. But the issue under § 924(c) is the number of times a firearm is used during a crime of violence, not the number of firearms. See United States v. Rawlings, 821 F.2d 1543, 1546 (11th Cir. 1987) (holding that the language and legislative history of § 924(c)'s "second or subsequent conviction" provision unambiguously shows "Congress' desire to deter and punish firearm use" even when the second or subsequent convictions were brought in the same indictment) (emphasis added).[2] Given the distinct nature of each carjacking and Moore's use of a firearm during each one, § 924(c) is not ambiguous as applied to Moore, and the district court did not err by declining to vacate his four "second or subsequent" § 924(c) convictions and sentences.

2.

---

[2] Moore cites several cases from other circuits holding that a defendant cannot be convicted of multiple § 924(c) charges when there is only one firearm and one use but multiple predicate offenses. See, e.g., United States v. Rentz, 777 F.3d 1105, 1107, 1115 (10th Cir. 2015) (en banc) (one § 924(c) charge when defendant used a firearm to kill one victim and the same bullet hit and killed a second victim); United States v. Wilson, 160 F.3d 732, 735, 749–50 (D.C. Cir. 1998) (one § 924(c) charge when defendant used a firearm to kill one victim and the killing resulted in one conviction of first degree murder and one conviction of killing of a witness with intent to prevent him from testifying). But unlike the defendants in those cases, Moore committed several, distinct crimes through several, distinct acts. The five carjackings occurred at different times, in different locations, with different victims, and he brandished a gun during each carjacking. Those differences make the difference.

11

Moore also argues that his consecutive firearms sentences are unconstitutionally excessive under the Eighth Amendment.  For Eighth Amendment challenges, we have recognized a "narrow proportionality principle that applies to noncapital sentences."  United States v. McGarity, 669 F.3d 1218, 1255 (11th Cir. 2012) (quotation marks omitted).  To succeed on such a challenge, the defendant must make a threshold showing that his sentence is grossly disproportionate to the offense.  Id. at 1256.  If he succeeds, then we will "consider the sentences imposed on others convicted in the same jurisdiction and the sentences imposed for commission of the same crime in other jurisdictions."  United States v. Raad, 406 F.3d 1322, 1324 (11th Cir. 2005) (quotation marks omitted).

Moore has not shown that his sentence is "grossly disproportionate" to his offenses.  In noncapital cases "successful challenges to the proportionality of particular sentences are exceedingly rare."  United States v. Farley, 607 F.3d 1294, 1343 (11th Cir. 2010) (quotation marks omitted).  And "[i]n general, a sentence within the limits imposed by statute is neither excessive nor cruel and unusual under the Eighth Amendment."  United States v. Johnson, 451 F.3d 1239, 1243 (11th Cir. 2006) (quotation marks omitted).  Moore's sentence falls within the sentencing range established and dictated by § 924(c), and it is not "grossly disproportionate" to Moore's crimes of using a firearm to threaten five different

12

victims in an attempt to steal five different cars.  The victim of each carjacking testified that Moore pointed a gun at them; three testified that he ordered them to get out of the car while doing so; and one testified that Moore shot the gun while she was running away.  See United States v. Yeary, 740 F.3d 569, 572–73 & n.3 (11th Cir. 2014) (summarily rejecting defendant's argument that his sentences, which included 960 months imprisonment on consecutive § 924(c) convictions, violated the Eighth Amendment).  Given the violent nature of the carjackings, the district court did not err by declining to vacate Moore's consecutive sentences under § 924(c). His sentence was not grossly disproportionate to his crimes, nor did it amount to cruel and unusual punishment.

**AFFIRMED.**[3]

---

[3] Although this case was originally on the oral argument calendar, it was removed under 11th Circuit Rule 34-3(f).